**LAMPI, LLC, a Delaware Limited Liability Corporation, Plaintiff,**

v.

**AMERICAN POWER PRODUCTS, INC., a California Corporation, Defendant.**

No. 93 C 1225.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 31, 1999.

Daniel O'Connor, David I. Roche, Baker & McKenzie, Chicago, IL, for plaintiff.

Keith deBrucky, Law offices of Keith deBrucky, Placentia, CA, Charles W. Shifley, Timothy C. Meece, Matthew P. Beck-

er, Banner & Witcoff, Ltd., Chicago, IL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ANDERSEN, District Judge.

This litigation is an action for patent infringement involving Lampi, LLC ("Lampi"), and American Power Products, Inc. ("APP"), two competing manufacturers of plug-in fluorescent night lights that are intended for residential use and do not require professional installation. This Court conducted an 11 day bench trial involving 7 witnesses and numerous exhibits. Following trial, the parties submitted post-trial briefs and this Court heard closing arguments. This memorandum and order contains this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. For the reasons discussed below, we find that the patents-in-suit, United States Patents No. 4,965,875 and 5,169,227, are valid and enforceable and that the two allegedly infringing fluorescent lights manufactured by the defendant do not infringe these patents literally or under the doctrine of equivalents.

## BACKGROUND

### I. The Parties

Lampi is a family-owned lighting company located in Huntsville, Alabama, and is the successor to the lighting business of Lampi Corporation which was founded in 1978. Lampi is owned by the Korte family. Heinrich Korte is the Chief Executive Officer of Lampi and his daughter, Heike Holderer, is the President and Chief Operating Officer. Lampi sells a full-line of fluorescent lighting products of different sizes and configurations for residential use. Lampi sells the bulk of its products to major retail home improvement chains in the United States. The Lampi product that is the subject of this litigation is the "Micro Lampi," a small fluorescent plug-in night light that is the commercial embodiment of United States Patents Nos. 4,965,-875 ("the '875 patent") and 5,169,227

("the '227 patent"). Lampi Corporation was the exclusive licensee of the '875 and '227 patents until Lampi assumed the licenses in early 1995.

APP is a California corporation headquartered in Chino, California, and was established in 1988. Like Lampi, APP sells fluorescent lighting fixtures for residential use to major home improvement retail chains. One of these products is known as the "Mini–Fluorescent," a small, self-supporting plug-in fluorescent light that Lampi claims infringes the '875 and '227 patents. The Mini–Fluorescent has accounted for a substantial portion of APP's total sales over the past several years. The APP Mini–Fluorescent is sold under different model numbers depending on the color and packaging. Model Nos. 5544 and 7744 are the white-colored versions of the Mini–Fluorescent. APP first began selling Model 5544 in September 1990. APP stopped producing Model 5544 in 1996 but continues to sell the remaining inventory. APP is still selling Model 7744. Syed Mohammed Afzal Hussain was one of the founders of APP and is currently the managing director and acting president of the company.

### II. The Invention

The Micro Lampi was the first miniature, self-supporting fluorescent light that could be plugged into an electrical outlet. Heinrich Korte and Theo Spix, an industrial designer, began developing the Micro Lampi in 1985. The Micro Lampi was first introduced in early 1986 at a trade show in Cologne, Germany. Later that year, the Micro Lampi was named the lamp of the year at a lighting trade show in Norway. Before the Micro Lampi the standard night light was an incandescent lamp. In the mid 1980s, the lighting industry was in the midst of developing fluorescent night lights because fluorescent bulbs were more efficient and had a longer life span than incandescent bulbs. Because fluorescent bulbs historically contained long linear elements, the challenge

was to create a fluorescent lamp small enough to be used as a residential nightlight. The small fluorescent lamps that existed at the time generally had an Edison screw-base characteristic of the common incandescent light bulb and, as a result, could not readily be plugged into an electrical outlet. The Micro Lampi can be plugged into a standard electrical outlet.

On October 23, 1990, the '875 patent, entitled "Flourescent Lamp," issued to inventors Heinrich Korte and Theo Spix. The claimed invention is a fluorescent lamp having a fluorescent tube and a connecting element for connection to a source of current. Broadly stated, the claimed invention is a small, self-supporting plug-in night light. The patent specification notes that fluorescent lamps are being used more frequently because they have greater longevity and consume less energy than traditional incandescent bulb lamps. Fluorescent lamps also make it possible to achieve the desired texture of light, as compared to incandescent lighting that is characterized by a yellowish hue and lower luminous efficiency that is often inadequate for illuminating working areas. Because of the advantages of fluorescent lighting, it is common for fluorescent lamps to be permanently installed above large working areas such as industrial office spaces and other similar areas. The '875 patent was designed to bring the advantages of fluorescent lighting to smaller spaces through a small fluorescent lamp that could be used to illuminate, for example, nightstands and desks.

### III. The Patent Claims

The '875 patent contains 19 claims, two of which are independent claims (Claims 1 and 11). An independent claim stands on its own and does not refer to any other claim in the patent. It must therefore be read separately when determining its scope. A dependent claim, on the other hand, includes a reference to at least one other claim in the patent and must be interpreted to encompass each of its own elements as well as any additional elements recited in the referenced claim. Independent Claim 1 of the '875 patent provides:

1. A fluorescent lamp comprising:

 a fluorescent tube, and

 a connecting element for establishing connection with a source of current, said connecting element including a light socket plug having contact plugs electrically connected to the fluorescent tube and projecting on one side, said light socket plug being shaped like a flat plug and the area of the connecting element facing the contact plugs being shaped as a housing for said fluorescent tube, said housing including two separable, identical half shells.

The second independent claim of the '875 patent is Claim 11 that provides:

11. A fluorescent lamp comprising:

 a fluorescent tube, and

 a connecting element for establishing connection with a source of current, said connecting element including a light socket plug having contact plugs electrically connected to the fluorescent tube and projecting on one side, said light socket plug being shaped like a flat plug and the area of the connecting element facing the contact plugs being shaped as a housing for said fluorescent tube, said housing having an oblong shape with the light socket plug being located on the longitudinal side thereof and projecting vertically from said longitudinal side, said housing including two separable, identical half shells.

The remaining 17 claims are dependent claims and read as follows:

2. A fluorescent lamp in accordance with claim 1, characterized in that the contact plugs are arranged in the junction plane of both half-shells (1).

3. A fluorescent lamp in accordance with claim 2, characterized in that

the half-shells are injection molded parts made of plastic.

4. A fluorescent lamp in accordance with claim 3, characterized in that in the interior of both half-shells there are both male and female notched elements which project out over the junction plane of the half-shells (1) which elements, when the housing is assembled, engage the matching notched elements of the corresponding other half-shell.

5. A fluorescent lamp in accordance with claim 3, characterized in that the interior space of the housing has the form of two contiguous sleeves which extend in a direction parallel to each other; and further characterized in that the first sleeve having a central wall area houses the fluorescent tube; the second sleeve, the electrical wiring needed to operate the fluorescent tube, and in that the mains plug is tip-stretched on the longitudinal edge of the second sleeve which faces away from the first sleeve.

6. A fluorescent lamp in accordance with claim 5, characterized in that the first sleeve has a recess in its side which serves as a window for the fluorescent lamp tube.

7. A fluorescent lamp in accordance with claim 6, characterized in that the recess extends over the central wall area of the first sleeve.

8. A fluorescent lamp in accordance with claim 6, characterized in that the recess is covered with a translucent covering.

9. A fluorescent lamp in accordance with claim 5, characterized in that the second sleeve opens out into chambers which border the front sides of the first sleeve on the outside of the first sleeve and in that contact vanes, providing frontal connecting contacts, for the fluorescent tube are arranged in the first sleeve, which vanes, through the chambers, establish electrical con-

tact with the wiring housed in the second sleeve.

10. A fluorescent lamp in accordance with claim 5, characterized in that the second sleeve opens out into chambers which border the front sides of the first sleeve on the outside of the first sleeve and in that contact vanes, providing frontal connecting contacts, for the fluorescent tube are arranged in the first sleeve, which vanes, through the chambers, establish electrical contact with the wiring housed in the second sleeve.

\* \* \* . \* \* \*

12. A fluorescent lamp in accordance with claim 11, and characterized in that the housing is approximately 17 cm in length, about 4 cm wide and 2 cm high.

13. A fluorescent lamp in accordance with claim 11, characterized in that the contact plugs are arranged in the junction plane of both half-shells.

14. A fluorescent lamp in accordance with claim 13, characterized in that the half-shells are injection molded parts made of plastic.

15. A fluorescent lamp in accordance with claim 14, characterized in that in the interior of both half-shells there are both male and female notched elements which project out over the junction plane of the half-shells which elements, when the housing is assembled, engage the matching notched elements of the corresponding other half-shell.

16. A fluorescent lamp in accordance with claim 14, characterized in that the interior space of the housing has the form of two contiguous sleeves which extend in a direction parallel to each other; and further characterized in that the first sleeve having a central wall area houses the fluorescent tube; the second

sleeve, the electrical wiring needed to operate the fluorescent tube, and in that the light socket plug is tip-stretched on the longitudinal edge of the second sleeve which faces away from the first sleeve.

17. A fluorescent lamp in accordance with claim 16, characterized in that the first sleeve has a recess in its side which serves as a window for the fluorescent lamp tube.

18. A fluorescent lamp in accordance with claim 17, characterized in that the recess extends over the central wall area of the first sleeve.

19. A fluorescent lamp in accordance with claim 17, characterized in that the recess is covered with a translucent covering.

The '227 patent is a continuation of the '875 patent. On December 8, 1992, the '227 patent, entitled "Fluorescent Lamp," issued to inventors Heinrich Korte and Theo Spix. The '227 patent contains 11 claims of which three are independent (Claims 1, 10, 11). The independent claims of the '227 patent are as follows:

1. A miniature fluorescent lamp comprising: a miniature fluorescent tube;

electrical means for operating said fluorescent tube, including connecting elements and an electric plug for establishing an electrical connection between said tube and an outlet:

a self-supporting elongated housing enclosing said electrical means and having support means for supporting said fluorescent tube, said housing having a first longitudinally-extending side defining a first interior channel in which said fluorescent tube is mounted, said first channel defining a window for the fluorescent tube and an opposite longitudinally-extending second side defining a second interior channel in which said electrical means is primarily housed, said electrical plug being in the form of plug blades, and extend-

ing generally outwardly and normally from said second housing side configured and dimensioned to support said housing and the flourescent tube in a self-supporting manner when inserted into an electrical outlet, said housing additionally having two closed ends enclosing the ends of the fluorescent tube and including a conduit which connects said first interior channel to said second interior channel and allows said electrical means to pass therethrough.

10. A miniature fluorescent lamp comprising: a miniature fluorescent tube;

electrical means for operating said fluorescent tube, including connecting elements and an electric plug for establishing an electrical connection between said tube and an outlet:

a self-supporting elongated housing having two separable half-shells, both half-shells being identically shaped, said housing enclosing and supporting said fluorescent tube and said electrical means, said housing having a first longitudinally-extending side defining a first interior channel in which said fluorescent tube is mounted, and an opposite longitudinally-extending second side defining a second interior channel in which said electrical means is primarily housed, said electrical plug extending generally outwardly and normally from said second housing side configured and dimensioned to support said housing and the fluorescent tube in a self-supporting manner when inserted into an electrical outlet.

11. A miniature fluorescent lamp comprising: a miniature fluorescent tube;

electrical means for operating said flourescent tube including connecting elements and an electric plug

for establishing an electrical connection between said tube and an outlet;

a self-supporting elongated housing having two separable half-shells, said half-shells being joined along a junction plane and said plug being arranged in said junction plane of said half-shells, said housing enclosing and supporting said fluorescent tube and said electrical means, said housing having a first longitudinally-extending said defining a first interior channel in which said fluorescent tube is mounted, and an opposite longitudinally-extending second side defining a second interior channel in which said electrical means is primarily housed, said electrical plug extending generally outwardly and normally from said second housing side configured and dimensioned to support said · housing and the fluorescent tube in a self-supporting manner when inserted into an electrical outlet.

The remaining eight claims of the '227 patent are dependent claims and read as follows:

2. The lamp according to claim 1, wherein said housing has an oblong shape.

3. The lamp according to claim 1, wherein said housing is approximately 17 cm in length, about 4 cm wide and 2 cm high.

4. The lamp according to claim 1, wherein said housing comprises two separable half-shells.

5. The lamp according to claim 4, wherein said· half-shells are injection molded parts made of plastic.

6. The lamp according to claim 4, wherein said half-shells each have male and female notched elements for joining said shells together.

7. The lamp according to claim 1, wherein said first side has a central section which extends generally the entire length of said housing and two end sections and a recess extends over said central section of said first side.

8. The lamp according to claim 7, additionally including a translucent covering for said recess.

9. The lamp according to claim 7, wherein said end sections of said first side have contacts for electrically coupling said tube to said connecting elements.

### IV. The Litigation

Lampi commenced this litigation against APP on February 26, 1993. On July 18, 1995, Lampi filed its seven-count Third Amended Complaint for declaratory and injunctive relief and damages against APP. Lampi alleged in Count I that the sale of APP's Mini–Fluorescent infringes both the '227 and '875 patents in violation of 35 U.S.C. § 271. Counts II and III alleged that the Mini–Fluorescent violates Lampi's federal and state trademark rights under the Lanham Act, 15 U.S.C. § 1125(a), and Illinois common law because the Mini–Flourescent is confusingly and deceptively similar to the Micro Lampi. Count IV alleged that APP's Mini–Fluorescent creates a likelihood of confusion or misunderstanding as to the affiliation, connection, or association of that light with Lampi in violation of the Illinois Uniform Deceptive Trade Practices Act and the Illinois Consumer Fraud and Deceptive Business Practices Act. Counts V through VII concerned Lampi's "Econo" fluorescent light and asserted the same claims that appear in Counts II–IV.

On August 24, 1995, APP filed its answer to the complaint asserting a litany of affirmative defenses. APP also counterclaimed for unfair competition in violation of the Lanham Act (Count I) and Illinois common law (Count II), deceptive trade practices and consumer fraud under the Illinois Uniform Deceptive Trade Practices Act and the Illinois Consumer Fraud and Deceptive Business Practices Act (Count III), interference with advantageous business relationships (Count IV), and trade

libel and disparagement (Count V). On December 5, 1995, we granted summary judgment in favor of APP on Counts II, III, and IV of Lampi's Third Amended Complaint on the ground that Lampi was estopped from asserting these claims in light of its prior assertions to the PTO concerning the dissimilar appearance of the Mini–Fluorescent. *Lampi Corp. v. American Power Prod.*, 1995 WL 723764 (N.D.Ill.Dec.5, 1995).

The remaining claims in this case include Counts I, V, VI, and VII of Lampi's Third Amended Complaint and Counts I–V of APP's counter-complaint. At trial, however, the parties addressed only Lampi's claim that APP's Mini–Fluorescent infringes the '227 patent (Count I). The parties did not offer any evidence on the other claims nor did they reserve the right to try these claims in a subsequent trial. In light of the parties' failure to offer any evidence on these claims, we will enter judgment on each of these claims against the party asserting it. Accordingly, we will discuss in detail the only issue that the parties addressed at trial, namely, whether APP's Mini–Fluorescent infringes the '227 patent.

## DISCUSSION

### I. Infringement

■ A patent is infringed by "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent...." 35 U.S.C. § 271(a). A determination of literal infringement requires a two-step analysis. First, the court must interpret the claims-in-suit to ascertain their scope and meaning. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The construction of a patent is purely a question of law for the court, not a jury. *Id.* at 979. Second, the fact finder must determine whether the defendant's allegedly infringing device falls within the scope of the claims as construed. *Id.* at 976. The plaintiff must establish by a preponderance of the evidence that the accused device meets every limitation of a claim either literally or as an equivalent. *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1476 (Fed.Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 177, 142 L.Ed.2d 144 (1998); *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1405–06 (Fed.Cir.1996).

### A. Markman Ruling

A patent is a governmental grant of rights that permits the patentee to exclude others from making, using, or selling the invention as claimed. 35 U.S.C. § 154. A patent also serves to put others on notice of what the patentee has removed from the public domain for the term of the patent. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). To accomplish these objectives, patent documents contain two distinct elements. The first is a specification that describes the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the same." 35 U.S.C. § 112. The second element is "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *Id.*; *Markman*, 517 U.S. at 373–74, 116 S.Ct. 1384 ("[t]he claim define[s] the scope of a patent grant and functions to forbid not only exact copies of an invention, but products that go to the heart of the invention but avoids the literal language of the claim by making a noncritical change") (internal quotations omitted).

■ Before resolving the issue of infringement, the court must determine the scope of the patent claims as a matter of law. *Markman*, 52 F.3d at 979. In light of the *Markman* ruling, the Federal Circuit has cautioned trial judges that:

[i]t may well be that in some cases one side or the other will offer the correct interpretation to the judge. More often, however, it is likely that the adversaries will offer claim interpretations arguably consistent with the claims, the specifica-

tion and the prosecution history that produce victory for their side. In any event, the judge's task is not to decide which of the adversaries is correct. Instead the judge must independently assess the claims, the specification, and if necessary the prosecution history, and relevant extrinsic evidence, and declare the meaning of the claims.

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.,* 64 F.3d 1553, 1556 (Fed.Cir.1995), *cert. denied,* 518 U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996).

█ To interpret the claims, the court must first examine the intrinsic evidence including the patent claims, the specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996); *Markman,* 52 F.3d at 979. The court need look no further than the available intrinsic evidence if one of ordinary skill in the art can interpret that evidence unambiguously. *Vitronics,* 90 F.3d at 1582. Indeed, if the intrinsic evidence "unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper." *Id.* at 1583; *Markman,* 52 F.3d at 981. The court can properly consider extrinsic evidence if the intrinsic evidence is ambiguous as to the breadth or meaning of the claims. *Bell & Howell Document Management Prods. Co. v. Altek Systems,* 132 F.3d 701, 705–06 (Fed.Cir.1997). Extrinsic evidence is that evidence which is external to the patent and file history including, among other things, expert testimony, inventor testimony, dictionaries, technical treatises and articles, and prior art not cited in the prosecution history. *Vitronics,* 90 F.3d at 1584.

█ The construction of the claims defines the rights of the patent owner. *Markman,* 52 F.3d at 978. Because it is the claims and not the specification that are subject to infringement, the court must neither narrow nor broaden the scope of a claim to give the patentee something different than what he has set forth. *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed.Cir.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). The court may look to the written description to define terms in the patent claims but may not incorporate the limitations in the written description into the claims. *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1248 (Fed.Cir.1998). The court generally must give the words in the claims their ordinary and customary meaning. *Vitronics,* 90 F.3d at 1582. In the end, the correct construction is the one "that stays true to the claim language and most naturally aligns with the patent's description of the invention...." *Renishaw,* 158 F.3d at 1250.

This Court held a Markman hearing before trial to define certain language in Claims 1 and 11 of the '875 patent and Claims 1, 10, and 11 of the '227 patent. After considering the relevant intrinsic evidence, we defined "half-shells" as "two equal or corresponding parts forming a hard or firm outer covering into which the housing of the fluorescent lamp is divided." *Lampi Corp. v. American Power Prod., Inc.,* 1997 WL 392239, at *9 (N.D.Ill. July 8, 1997).[1] We also found that the term "identical," which modifies "half-shells" in Claims 1 and 11 of the '875 patent and Claim 10 of the '227 patent, means "the same or exactly alike." *Id.* We defined "first interior channel" as "an interior sleeve where the fluorescent tube is contained," and "second interior channel" as "an interior sleeve where the electrical components are contained." *Id.* Finally, we found that "conduit" means "a connecting passage which connects the area containing the tube (first interior channel) with the area containing the electrical components (second interior channel) and allows the wiring to pass from the first channel to the second channel." *Id.*

---

1. For the purposes of this memorandum opinion and order, we assume familiarity with all aspects of our prior *Markman* ruling.

The parties now disagree on the meaning of the "support means" limitation in Claim 1 of the '227 patent. The parties agree, and we think correctly, that this is a means-plus-function limitation because it is expressed in the means-plus-function language and does not recite definite structure. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427–28 (Fed.Cir.1997) (holding that the use of the word "means" in a patent claim raises a presumption that it is a means-plus-function element unless the claim recites sufficient structure or material for performing the function or it specifies no corresponding function for the means). Because a means-plus-function limitation, if construed literally, would cover every conceivable structure that could perform the recited function, 35 U.S.C. § 112, ¶ 6 "provide[s] a standard to make the broad claim language more definite." *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042 (Fed.Cir.1993). Section 112 ¶ 6 states, in part, that the means-plus-function limitation "shall be construed to cover the corresponding structure, material or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6.

 A means-plus-function limitation must "particularly point out and distinctly claim the invention." *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed.Cir. 1994). "[I]f one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language." *Id.* In this regard, § 112 operates like a reverse doctrine of equivalents because it restricts the coverage of literal claim language. *Valmont*, 983 F.2d at 1042 (noting that § 112 has a "string attached" that limits the applicant to the structure, material, or acts in the specification and their equivalent). While the patent specification must describe some enabling means for performing the function set forth in the limitation, " 'there is and can be no requirement that applicants describe or predict every possible means of accomplishing that function.' " *In re Hayes Microcomputer Prod., Inc. Patent Litigation*, 982 F.2d 1527, 1535 (Fed.Cir. 1992) (quoting *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir.1985)).

 At trial, the parties presented expert testimony regarding the construction of "support means" in Claim 1 of the '227 patent. Lampi presented as its patent expert Richard Bushnell, a lawyer who has practiced intellectual property law for the past 48 years. (Tr. 409). Bushnell opined on cross-examination that the "support means" identified in Claim 1 of the '227 patent is a notch in the "end wall" of the first channel of the housing. (*Id.* 476). Specifically, Bushnell testified that "[t]he Lampi patent shows in figure—in the drawings and describes in the specification a—vein or web which they put the reference numeral 8 on in which an element 7 connecting with the—the fluorescent tube is supported in a notch." (*Id.* 475). APP called as its expert Keith Rockey, a patent lawyer and a founding member of the Barristers of Patent Law in Chicago. (*Id.* 841). He identified the "support means" in Claim 1 as a "slot" or "notches" in the front side of the first channel. (*Id.* 848, 859, 1219). Therefore, both experts interpreted the "support means" disclosed in the patent as a notch in the front sides, or "end walls," of the first sleeve.

Both Lampi and APP rely on this testimony to support their own interpretation of "support means." As noted above, however, we cannot consider this testimony unless the intrinsic evidence, i.e. the patent claims, specification, and prosecution history, of the '227 patent fails to provide the answer. *Vitronics*, 90 F.3d at 1584. The specification contains several references to the structure that corresponds to the support means limitation. The specification states that a "half-shell 1, which together with a second, identical half-shell 1 can form a connecting element which is shaped into a housing which supports a fluorescent lamp tube 5." (PX 1, Col. 3., L.L. 31–34). It also provides that "the shape of the first sleeve has been adapted to fit the fluorescent lamp so that the fluorescent tube can be inserted into this sleeve and is

held in the first sleeve without slack." (*Id.* Col. 2, L.L. 59–62). The specification further discloses that "[t]he fluorescent lamp tube 5 is inserted into the first sleeve 3 the tube having connecting contacts 6 which snugly rest against electrical contact vanes 7 provided on the front side 8 of the first sleeve. . . ." (*Id.* Col. 3, L.L. 39–43).

Lampi asserts that the "support means" is "a rounded portion of the housing wherein the tube sits, with the glass making contact with the housing." (Post–Trial Br. at p. 7). Lampi principally relies on the reference in the specification that the housing supports the fluorescent tube and the patent drawings which, in its view, "show the tube supported by a rounded section of the housing, in the nature of a cradle, against which the glass portion of the tube rests." (*Id.* at 5). APP maintains that the specification discloses a "sleeve having front sides" as the part of the housing that supports the tube. (Post–Trial Br. at p. 12). We find that the

specification, taken as a whole, clearly links or associates the first sleeve having front sides as the structure of the housing corresponding to the support means limitation. The specification indicates that the fluorescent tube is supported in the first sleeve by the front sides that allow the connecting contacts of the fluorescent tube to rest snugly against electrical contact vanes. The prosecution history supports this by noting that "sleeve 3 is the part of the housing which specifically support the fluorescent tube." (DX 13, p. 1194).

In reaching this conclusion, we reject Lampi's argument that the rounded portion of the housing is the support means because there is nothing in the specification or drawings that clearly links or associates that structure to the support means limitation. Lampi maintains that Figure 1 of the '227 patent, reproduced below, shows a portion of the housing extending below the fluorescent tube so that the tube rests on the first sleeve for support.

FIG. 1

We reject this interpretation of Figure 1 because it is a top view of a half-shell that does not show the tube resting on the housing. Figure 1 merely shows a portion of the housing extending underneath the fluorescent tube, not the tube resting on the housing. Perhaps more importantly, the cross-section and side-view of the half-shell in Figures 2 and 3 do not show the

fluorescent tube resting on the rounded portion of the housing. Moreover, none of these diagrams show the connecting contacts of the fluorescent tube extending through notches on the front sides of the first sleeve, nor does the specification mention a "notch" as the support means. Accordingly, the support means cannot be a "notch" in the front side of the first sleeve as the experts testified at trial.

FIG. 3

FIG. 2

In conclusion, we find that "support means" in Claim 1 is a means-plus-function limitation, and that the intrinsic evidence of record clearly links or associates the first sleeve having front sides as the structure of the housing with the support means limitation. This interpretation, to be sure, departs from that offered by the experts at trial. But as discussed previously, this Court has an independent obligation to assess the intrinsic evidence and define the claim limitations. *Lubrizol,* 64 F.3d at 1556. As to the remaining disputed limitations in Claims 1 and 11 of the '875 patent and Claims 1, 10, and 11 of the '227 patent, those terms are defined as noted above and as fully explained in this Court's July 8, 1997 Memorandum Opinion and Order. *Lampi Corp. v. American Power Prod., Inc.,* 1997 WL 392239, at *9 (N.D.Ill. July 8, 1997)

### B. Literal Infringement

■ A patent is literally infringed when every limitation recited in a claim is found in the accused device. *Kahn,* 135 F.3d at 1477. A defendant cannot avoid infringement by merely adding elements to its accused device if each limitation recited in the claim is found in the device. *Stiftung v. Renishaw PLC,* 945 F.2d 1173, 1178 (Fed.Cir.1991); *A.B. Dick Co. v. Burroughs Corp.,* 713 F.2d 700, 703 (Fed.Cir. 1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984). "For example, a pencil structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine that limits or controls what the pencil can write. Neither would infringement be negated simply because the patentee failed to contemplate use of the pencil in that environment." *Burroughs,* 713 F.2d at 703.

Moreover, "if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims." *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1121 (Fed.Cir.1985).

### 1. APP Models 7744 and 5544 Do Not Literally Infringe the '875 Patent or Claim 10 of the '227 Patent.

■ The '875 patent contains 19 claims, two of which are independent claims (Claims 1 and 11). Independent Claims 1 and 11 describe a housing that "includes two separable, identical half shells." Similarly, independent Claim 10 of the '227 patent claims a "self-supporting elongated housing having two separable half-shells, both half-shells being identically shaped...." The parties agreed at the *Markman* hearing that "identical" modifies "half-shells." *Lampi Corp. v. American Power Prod., Inc.,* 1997 WL 392239, at *7 (N.D.Ill. July 8, 1997). In our *Markman* ruling, we found that the term "identical," when used in the context of "identical half shells" in Claims 1 and 11 of the '875 patent or "half-shells identically shaped" in Claim 10 of the '227 patent, means the same or exactly alike. *Id.* at *7–8. We found that this interpretation was consistent with the ordinary and customary meaning of "identical." *Id.* In doing so, we rejected Lampi's contention that we should define "identical" as similar or having such close resemblance as to be essentially the same, thereby allowing for small differences between the half-shells. *Id.*

In light of this interpretation, Lampi decided not to present any evidence at trial regarding infringement of Claims 1

and 11 of the '875 patent or Claim 10 of the '227 patent. (Tr. 606). As a result, Lampi did not argue during closing argument or in its post-trial brief on infringement that APP Models 5544 and 7744 literally infringe these claims. Lampi's failure to present any evidence on these issues dooms its claims that APP Models 5544 and 7744 literally infringe Claims 1 and 11 of the '875 patent or Claim 10 of the '227 patent. *Kegel Co. v. AMF Bowling, Inc.,* 127 F.3d 1420, 1425 (Fed.Cir.1997) (noting that "[t]he plaintiff has the burden of proving infringement by a preponderance of the evidence."). In any event, a cursory inspection of APP Models 5544 and 7744 reveals that these products do not have half-shells that are the same or exactly alike so as to read on Claims 1 and 11 of the '875 patent or Claim 10 of the '227 patent. Accordingly, we find that Lampi has failed to establish by a preponderance of the evidence that Models 5544 and 7744 literally infringe Claims 1 and 11 of the '875 patent or Claim 10 of the '227 patent.

### 2. APP Models 7744 and 5544 Do Not Literally Infringe Claims 1 and 11 of the '227 Patent.

■ Lampi presented the expert testimony of Bushnell and Thomas Lemons in support of its literal infringement claims. Using six enlarged diagrams, Bushnell and Lemons compared each limitation in the claims of the '227 patent with APP Models 7744 and 5544. These diagrams set forth the language of the patent claim on one side while on the other identify the allegedly corresponding structure in the APP models. Bushnell and Lemons opined that APP Models 7744 and 5544 meet every limitation in Claims 1–9 and 11 of the '227 patent. APP limits its noninfringement arguments in its post-trial brief to the following issues: (1) whether Model 5544 has "support means" as required in Claim 1; (2) whether Model 7744 has a "first interior channel" and "support means" as set forth in Claim 1; (3) whether Model 5544 has "two half-shells" as required by Claim 11; and (4) whether Model 7744 has a "first interior channel" as set forth in

Claim 11. We address each of these limitations in turn.

### a. Models 5544 and 7744 Do Not Literally Infringe Claim 1 Because They Lack the Support Means Limitation.

■ As noted above, the support means limitation in Claim 1 of the '227 patent is a means-plus-function clause. The intrinsic evidence of the '227 patent clearly links or associates the first sleeve having front sides as the structure of the housing with the support means limitation. The question then becomes whether APP Models 5544 and 7744 infringe this limitation. A means-plus-function limitation is infringed if the accused device "perform[s] the identical function as that identified in the means clause and do[es] so with structure which is the same as or equivalent to that disclosed in the specification." *O.I. Corp. v. Tekmar Co.,* 115 F.3d 1576, 1581 (Fed.Cir.1997) (internal quotations omitted). The test of equivalence under § 112, ¶ 6 is "whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1309 (Fed.Cir.1998). An insubstantial change is something that "adds nothing of significance to the structure, material, or acts disclosed in the patent specification." *Valmont,* 983 F.2d at 1043.

There is no dispute that each accused device has some structure that supports the flourescent tube. The tube in Model 5544 is supported by two mating, semicircular brackets that extend out from the front and rear pieces of the housing. In Model 7744, the flourescent tube is supported by two cradles that project out from the half-shells of the housing. While both models have some structure that supports the fluorescent tube, we must determine whether Models 5544 and 7744 have a support means that has the same structure as that disclosed in the '227 patent. *Odetics, Inc. v. Storage Tech. Corp.,* 185

F.3d 1259, 1267 (Fed.Cir.1999) (noting that "the equivalence (indeed, identity) of the 'function' of the assertedly substitute structure, material, or acts must be first established in order to reach the statutory equivalence analysis" under § 112, ¶ 6.). The fluorescent tube in the '227 patent is held in the first sleeve by front sides at the immediate ends of the tube. We find that the two semi-circular brackets in Model 5544 and the two cradles in Model 7744 are not the same structure as the front sides disclosed in the '227 patent.

We also find that the accused devices lack a support means with equivalent structure as that disclosed in the '227 patent. The front sides of the first sleeve in the '227 patent are sized to the length of the fluorescent tube to hold the tube snugly in place without slack or movement. The cradles in the 7744 product and the semi-circular brackets in Model 5544 support the tube differently than the front sides of the first sleeve that provide complete support for the tube. These structures provide support by touching the glass portion of the tube rather than the ends of the tube. Thus, the structure in each of the accused devices that supports the tube does not prevent lateral movement at the tube's immediate ends. As a result, neither the cradle nor the brackets enclose the tube so as to prevent the tube from moving in all four directions. These are substantial changes that preclude infringement through equivalent structure under § 112, ¶ 6. Id. at 1267 (differences are insubstantial "if the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification.").

### b. Model 7744 Does Not Literally Infringe Claims 1 or 11 Because It Lacks A First Interior Channel.

The "First interior channel" limitation in Claims 1 and 11 means "an interior sleeve where the fluorescent tube is contained." *Lampi Corp. v. American Power Prod., Inc.*, 1997 WL 392239, at *9 (N.D.Ill. July 8, 1997). APP argues that Model 7744 does not literally infringe Claims 1 and 11 because it lacks a "first interior channel" inside the housing for the tube. This argument is based on the premise that the plastic diffuser, or translucent cover, is not part of the housing that defines the first interior channel in Model 7744. APP claims that the first interior channel in Claims 1 and 11 is defined by the half-shells, i.e. the housing, without the assistance of a translucent cover. Lampi argues that a housing encloses the electrical components of the lamp and protects them from dust. Lampi claims that the translucent cover, together with the two plastic half-shells, performs this function in the 7744 product. Therefore, "[i]t is foolish semantics to say that the two half shells are the housing and the translucent cover is not." (Mem. at 11). Lampi concludes that "there is nothing in Claim 1 or Claim 11, the specification or the file history, which dictates that the diffuser cannot be considered part of the housing." (*Id.* at 10).

We find that the translucent cover, or diffuser, is not part of the housing that defines the first interior channel in Claim 1 of the '227 patent. Claim 1 describes a housing that has a "first longitudinally-extending side defining a first interior channel in which said fluorescent tube is mounted, said first channel defining a window for the fluorescent tube...." This language indicates that the housing has a first interior channel which, in turn, defines a window for a fluorescent tube. Because the first interior channel defines the window, the first interior channel is defined without reference to a window or any translucent cover that would cover the window. Stated another way, the first interior channel is defined by the half-shells without the assistance of a translucent cover. Thus, the translucent cover is not an element of the housing that forms the first interior channel in Claim 1. This is consistent with the specification which provides that "[t]he interior of the housing formed by both half-shells.... In the side

of the first sleeve 3 there is a recess which functions to permit emergence of light from the fluorescent lamp tube." (Col.3, L.L.37, 50–52).

We also find that the translucent cover is not part of the housing that defines the first interior channel in Claim 11. Claim 11 describes a housing "having two separable half-shells ... said housing enclosing and supporting said fluorescent tube and said electrical means, said housing having a first-longitudinally-extending side defining a first interior channel in which said fluorescent tube is mounted...." This language indicates that the housing both encloses *and* supports the fluorescent tube and electrical components. The only elements of Claim 11 that both support and enclose the fluorescent tube are the two separable half-shells. These half-shells enclose the ends of the tube and support the fluorescent tube and electrical components. While the translucent cover, or diffuser, assists the two half-shells in fully enclosing the fluorescent tube, there is no indication whatsoever in the intrinsic evidence of the '227 patent that the translucent cover supports the fluorescent tube and electrical components. We conclude that, because the translucent cover does not both enclose and support the fluorescent tube, it is not part of the housing as disclosed in Claim 11.

We conclude that Model 7744 does not literally infringe Claims 1 or 11 because it lacks "an interior sleeve where the fluorescent tube is contained." We find that the housing of Model 7744 is formed by the two plastic half-shells. These half-shells protect the electrical means or, as stated in Claims 1 and 11, form "a second interior channel in which said electrical means is primarily housed ...." This means that the diffuser, which does not support either the electrical means or the fluorescent tube, is not part of the housing. In Model 7744, the fluorescent tube rests on cradles provided on the top sides of the two half-shells. Thus, the fluorescent tube is not inside an "interior sleeve" because it is not within the half-shells that form the housing. Unlike Claims 1 and 11, Model 7744

has a "first interior" channel only with reference to the translucent cover. We reject Lampi's argument that a first interior sleeve on Model 7744 is defined by the armatures and end tabs of the half-shells because these structures do not enclose any portion of the fluorescent tube so that the tube is in the interior of the housing as disclosed in the '227 patent.

### c. Model 5544 Does Not Literally Infringe Claim 11 Because It Lacks Two Half–Shells.

The "half-shells" limitation in Claims 1 and 11 means "two equal or corresponding parts forming a hard or firm outer covering into which the housing of the fluorescent lamp is divided." *Lampi Corp. v. American Power Products, Inc.*, 1997 WL 392239, at *9 (N.D.Ill. July 8, 1997). We find that Model 5544 lacks "half-shells" because it includes five parts and does not have two parts that are both "equal or corresponding" to form an "outer covering into which the housing ... is divided." In other words, the outer covering of Model 5544 is not "divided" into "two equal or corresponding parts." Lampi objects to this conclusion arguing that it allows APP to avoid infringement merely because Model 5544 uses other parts, in addition to the two half-shells, to make up the housing. Lampi claims that this is contrary to the term "comprising," an open-ended modifier that precludes a party from avoiding infringement by adding elements to a device that contains each element in the claim. We reject this argument because Model 5544 does not have "half-shells" as defined in this Court's *Markman* ruling. Therefore, APP is not attempting to avoid infringement by adding elements to a device that reads on Claim 11.

Lampi also asserts that a letter from APP's patent attorney establishes that Model 5544 has half-shells. This December 2, 1991 letter was written by APP's prior counsel and addressed whether Model 5544 literally infringed the '875 patent. In that letter, APP's lawyer commented that Model 5544 does not literally infringe

the '875 patent because it lacks half-shells that are identical—"[t]he half shells of the American Power Products mini-light includes two half shells which are *not identical*, as you can see." (PX 10). Lampi claims that this is an admission that Model 5544 has half-shells. We reject this argument because APP's lawyer did not have the benefit of this Court's *Markman* ruling. As noted above, Model 5544 does not have half-shells as disclosed in Claim 11 because it includes five parts and does not have two parts that are both "equal or corresponding" to form an "outer covering into which the housing ... is divided." That a lawyer who never testified in this case asserted that Model 5544 has "half-shells" is not a basis for this Court to disregard the meaning ascribed to this term by the intrinsic evidence of the '227 patent.

### d. Conclusion on Literal Infringement

Based on the foregoing, we find that Lampi has not established by a preponderance of the evidence that Model 5544 or Model 7744 literally infringe independent Claims 1, 10, or 11 of the '227 patent or independent Claims 1 or 11 of the '875 patent. Accordingly, we find that APP Models 7744 and 5544 do not literally infringe independent Claims 1, 10 or 11 of the '227 patent or independent Claims 1 or 11 of the '875 patent. We also find that, because the remaining dependent claims of the '227 and '875 patents incorporate all of the elements of the independent claims, Lampi has also failed to establish by a preponderance of the evidence that Model 5544 or Model 7744 literally infringe dependent claims 2–10 and 12–19 of the '875 patent or dependent claims 2–9 of the '227 patent.

### C. Doctrine of Equivalents

The doctrine of equivalents protects a patentee from competitors who "make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim ...." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607, 70 S.Ct. 854,

856, 94 L.Ed. 1097 (1950). The Supreme Court recently clarified the doctrine in *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). There, the Court held that equivalency must be determined objectively on an element-by-element basis. *Id.* at 25, 117 S.Ct. 1040. The essential inquiry is whether "the accused product or process contain elements identical or equivalent to each claimed element of the patented invention." *Id.* at 40, 117 S.Ct. 1040. The plaintiff must prove by a preponderance of the evidence either that the substituted element in the accused device performs substantially the same function in substantially the same way to produce substantially the same result as the element at issue or that insubstantial differences exist between the substitute element and the claimed element. *Id.*

Both parties devote a substantial portion of their briefs arguing whether prosecution history estoppel applies to the "support means," "first interior channel," and "two half-shells" limitations. We need not decide whether prosecution history estoppel applies because, even if Lampi overcame that hurdle, Lampi has produced no evidence that the accused products infringe under the doctrine of equivalents. The evidence Lampi presented at trial addressed solely the issue of literal infringement. Lampi asserted during closing argument that the expert testimony of Lemons supports a finding of equivalency. But this testimony addressed only whether the accused devices meet each limitation in the Claims 1–9 and 11 of the '227 patent, not whether insubstantial differences exist between the substitute elements and the claimed elements. This is insufficient because the equivalency determination cannot be subsumed in the literal infringement analysis and the plaintiff must present more than generalized testimony of similarity between the patent and the accused products. *Comark Communications v. Harris Corp.*, 156 F.3d 1182, 1188 (Fed.Cir.1998).

In any event, we find that the accused products do not infringe Claims 1–9 and 11 of the '227 patent under the doctrine of equivalents because they do not include an equivalent for the "support means," "first interior channel," and "two half-shells" limitations. The accused products do not support the fluorescent tube in substantially the same way to produce substantially the same result as the '227 patent. The front sides of the first sleeve in the '227 patent are sized to the length of the fluorescent tube to hold the tube snugly without slack. The cradles in Model 7744 and the semi-circular brackets in Model 5544 support by touching the glass portion of the tube rather than the ends of the tube. This results in the tube lacking support in all directions as in the '227 patent. The accused devices are also substantially different than the patented device which encloses the tube and the electrical means by merely assembling the half-shells. Model 5544 substantially departs from the half-shell concept by requiring five parts to enclose the tube and electrical components, and in Model 7744 the tube is not enclosed without the fluorescent cover.

For these reasons, we conclude that the accused products do not infringe Claims 1–9 and 11 under the doctrine of equivalents because they do not have an equivalent for the "support means," "first interior channel," and "two half-shells" limitations.

## II. Invalidity

APP contends that Claims 1–9 and 11 of the '227 patent are not entitled to the filing date of the '875 patent because the '875 specification does not disclose a miniature fluorescent lamp without identical half-shells. APP argues that, without the benefit of the '875 filing date, Claims 1–9 and 11 are anticipated by international PCT application published in August 1987 and Lampi's sales of the Micro Lampi. 35 U.S.C. § 102(b). APP also claims that the '227 patent is invalid because the Micro Lampi was on sale more than one year before Lampi applied for a patent. *Id.* Because the '227 patent is presumed to be valid, *see* 35 U.S.C. § 282, APP has the burden of proving invalidity by clear and convincing evidence. *Monarch Knitting Machinery Corp. v. Sulzer Morat Gmbh,* 139 F.3d 877, 881 (Fed.Cir.1998); *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1050 (Fed.Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). With these standards in mind, we address each of APP's contentions in turn.

### A. Claims 1–9 and 11 of the '227 Patent Are Not Invalid For Anticipation Under 35 U.S.C. § 102(b).

APP contends that Claims 1–9 and 11 of the '227 patent are anticipated by international PCT application published in August 1987 and Lampi's sales of the Micro Lampi. APP bases this argument on the premise that Claims 1–9 and 11 are not entitled to the filing date of the '875 patent because the '875 specification does not disclose a miniature fluorescent lamp without identical half-shells. Under 35 U.S.C. § 112, a claim in a later-filed application is entitled to the filing date of an earlier application if the earlier application complies with the written description requirement of § 112, ¶ 1. This requirement is met if "the disclosure of the application relied upon reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter." *Ralston Purina Co. v. Far–Mar–Co. Inc.,* 772 F.2d 1570, 1575 (Fed.Cir.1985) (internal quotations omitted); *see also Transco Prods. Inc. v. Performance Contracting, Inc.,* 38 F.3d 551, 557 (Fed.Cir. 1994) (noting that "an application is entitled to the benefit of the filing date of an earlier application as to common subject matter."), *cert. denied,* 513 U.S. 1151, 115 S.Ct. 1102, 130 L.Ed.2d 1069 (1995).

APP relies principally on *Tronzo v. Biomet Inc.,* 156 F.3d 1154 (Fed.Cir. 1998), in support of its argument that the specification of the '875 does not meet the written description requirement of § 112, ¶ 1 relative to Claims 1–9 and 11 of the '227 patent. There, the Federal Cir-

cuit found that certain claims in the patent-in-suit were not entitled to the earlier filing date of the parent application because the specification of the parent application did not meet the written description requirement of § 112, ¶ 1 relative to those claims. *Id.* at 1158–59. The parent application in *Tronzo* disclosed only a single structure—conical-shaped cups. *Id.* at 1159. The claims of the patent-in-suit, in contrast, were generic as to the shape of the cup. *Id.* The Court found that there was nothing in the parent application suggesting that the patent encompassed additional cone shapes. *Id.* Indeed, the patent application touted the advantages of the conical shape as compared to other cones found in the prior art. *Id.* Because the parent application was narrowly limited to conical-shaped cones, the patent-in-suit could not benefit from the earlier filing date. *Id.*

The *Tronzo* decision is distinguishable from this case. In *Tronzo,* the patent-in-suit was based on a continuation-in-part application that added new subject matter to that contained in the parent application. *Id.* at 1157. Here, the '227 patent is based on the same specification as the '875 patent. Also, while the specification of the '875 contains references to identical half-shells, it is not so narrowly tailored as the specification in *Tronzo.* Moreover, the Patent Examiner never rejected Lampi's application for failure to satisfy the enabling requirement of § 112, ¶ 1. For these reasons, we find that APP has failed to rebut the statutory presumption that the '227 patent is valid with clear and convincing evidence that the specification of the '875 patent does not enable a person skilled in the art to make and use the invention claimed in Claims 1–9 and 11 of the '227 patent. Accordingly, these claims are entitled to the filing date of the '875 patent and are not invalid under § 102(b) as being anticipated by international PCT application published in August 1987 and Lampi's sales of the Micro Lampi.

**B. The '227 Patent Is Not Invalid Under 35 U.S.C. § 102(b) For Being On–Sale.**

APP next argues that the '227 patent is invalid because the Micro Lampi was on sale more than one year before Lampi applied for a patent. Under § 102(b), the United States Patent and Trademark Office ("PTO") will not grant a patent on an invention that has been in public use or sale in the United States more than one year before its filing date. A defendant asserting invalidity under the on-sale bar must establish that two conditions existed before the critical date. *Pfaff v. Wells Elecs., Inc.,* 525 U.S. 55, 119 S.Ct. 304, 311, 142 L.Ed.2d 261 (1998). First, the defendant must show that the product was the subject of a commercial offer of sale. *Id.* Second, the defendant must establish that the invention was ready for patenting. *Id.* 119 S.Ct. at 312. This condition can be satisfied by proof of reduction to practice or by proof that "the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* These elements must be established by clear and convincing evidence. *Abbott Lab. v. Geneva Pharmaceuticals, Inc.,* 182 F.3d 1315, 1317 (Fed.Cir.1999).

APP presented no evidence at trial that the Micro Lampi was the subject of a commercial offer of sale before February 1986, the critical date for purposes of the on-sale bar. Indeed, Lampi presented substantial evidence at trial that the Micro Lampi was first offered for sale in the United States in September 1986. Specifically, Ms. Holderer testified that Lampi started selling the Micro Lampi in September 1986 (Tr. 48). Lampi supported Ms. Holderer's testimony with numerous records which establish that the Micro Lampi was first sold in the United States in September 1986. APP failed to introduce clear and convincing evidence to the contrary. For these reasons, we find that

the Micro Lampi was first on sale in the United States in September 1986.

▆▆▆▆ Nevertheless, APP contends that Lampi has made statements that prevent it from denying that the Micro Lampi was on sale before February 1986. The doctrine of judicial estoppel is an equitable concept that forbids a litigant from obtaining victory in a prior proceeding and then repudiating the grounds for that victory in a different case to win a second victory. *Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1427 (7th Cir.1993). While there are no hard and fast rules guiding the application of the doctrine, the Seventh Circuit has identified three prerequisites to its application: (1) the latter position must be clearly inconsistent with the earlier position; (2) the facts at issue must be the same in each case; and (3) the party to be estopped must have convinced the first court to adopt its position. *Levinson v. United States,* 969 F.2d 260, 264 (7th Cir.), *cert. denied,* 506 U.S. 989, 113 S.Ct. 505, 121 L.Ed.2d 441 (1992). The doctrine should not be applied when the former position was the result of inadvertence or mistake or when there is only an appearance of inconsistency between the two positions. *In Matter of* Cassidy, 892 F.2d 637, 642 (7th Cir.), *cert. denied,* 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990).

▆▆▆ On March 29, 1991, Lampi applied to the PTO to register the external design of the Micro Lampi as a trademark. The PTO Examiner rejected the application because the Micro Lampi was not distinctive enough and because it was functional. On February 10, 1992, Lampi responded to this rejection asserting that the Micro Lampi was not functional because many competitive products had designs for small plug-in fluorescent lights that were not similar to the Micro Lampi. The Examiner again rejected the application because Lampi had failed to distinguish the Micro Lampi trademark from other products in the marketplace. The Examiner suggested that Lampi could overcome this rejection by adopting the following statement, if accurate: "the mark has ... [been] used

in commerce for at least seven years immediately before the date of this statement and substantial advertising since 1986." Lampi incorporated this statement in its second response submitted on January 5, 1993. On July 20, 1993, the PTO issued Lampi a trademark for the Micro Lampi.

Lampi also made other statements during the PTO proceedings indicating that the Micro Lampi was on sale in the United States more than one year before Lampi applied for a patent. In the March 1991 trademark application, Mr. Korte declared that the Micro Lampi "was first used on the goods in July, 1985, was first used in interstate commerce in July, 1985, and is now in use in such commerce." (DX 1 at 7–8). On February 10, 1992, Ms. Holderer declared that the Micro Lampi was "first used in interstate commerce in July 1985 and is now in use in such commerce. The product which is sold is ... [the] Micro Lampi." (*Id.* at 26, 29). Thus, Lampi represented to the PTO that the Micro Lampi was first used in interstate commerce in July 1985. Also, in this litigation, Lampi asserted in its original and amended complaints that, "[c]ommencing in or about 1985, Lampi's products, as sold throughout the United States ... have included a certain fluorescent lamp sold under the trademark Micro Lampi." (Compl.¶ 12). This contradicts the position taken by Lampi at trial, namely, that it first began selling the Micro Lampi in September 1986. (Tr. 49).

As noted above, the evidence at trial clearly established that the Micro Lampi was first on-sale in September 1986. While Lampi took a contrary position before the PTO, we find that the doctrine of judicial estoppel is inapplicable because Lampi's representations to the PTO were the product of inadvertence and mistake. Ms. Holderer testified that she misunderstood the meaning of "use in commerce" when she represented to the PTO that 1985 was the first time the Micro Lampi was sold in the United States. She testified that she mistakenly believed that sub-

mitting preliminary plans to a tool and die maker to make the Micro Lampi housing constituted "use in commerce" rather than the PTO's understanding of "use in commere" as a phrase for sales. (*Id.* at 157). We believe that Ms. Holderer's testimony was credible on this point.

There is also no evidence that Lampi benefitted from its representations to the PTO that the Micro Lampi was on sale in the United States in July 1985. Under federal trademark law, proof of five or more years of continuous and exclusive use in commerce is prima facie evidence that a mark has become distinctive. 15 U.S.C. § 1052(f). Lampi did not have to establish that the Micro Lampi was on sale in the United States in July 1985 to satisfy this requirement. Because the July 1985 date was immaterial to overcoming the PTO Examiner's objections, Lampi did not have a motive to misrepresent the date on which the Micro Lampi was first offered for sale in the United States. Absent evidence that Lampi benefitted from its representations to the PTO, this Court will not estop Lampi from asserting its patent rights. Further, Lampi amended its trademark application by changing the starting date for sales of the Micro Lampi in the United States from July 1985 to September 1986. This amendment supports the conclusion that the initial representation was the product of inadvertence and mistake.

In conclusion, we find that the evidence introduced at trial establishes that the Micro Lampi was first on sale in the United States in September 1986. We also find that Lampi is not estopped from relying on this date because the contrary position Lampi took in the trademark proceedings before the PTO was the product of inadvertence and mistake. Accordingly, the '227 is not invalid under 35 U.S.C. § 102(b) for being on sale before February 1986.

### C. Obviousness Under 35 U.S.C. § 103(a).

35 U.S.C § 103(a) provides that "[a] patent may not be obtained though the inven-tion is no identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." APP contends that "if claims 1–9 and 11 of the '227 patent read on the APP products in suit, then they equally read on obvious combinations of the Williams, Pollard, Zeller, Lampi, and common night light prior art." (Mem. at 26). While APP introduced substantial evidence at trial regarding these patents and the common night light prior art, APP indicates in its post-trial brief that it "does not choose to read Lampi's 227 patent claims to invalidate them. However, if they are read broadly, they are invalid." (*Id.* at 27). Because we do not read the claims in the '227 patent so broadly that APP Models 7744 and 5544 read on Claims 1–9 and 11 of the '227 patent, we need not address APP's obviousness defense.

### CONCLUSION

For all of the foregoing reasons, we find that Lampi has failed to establish by a preponderance of the evidence that the accused APP devices infringe any of the claims of the '875 or '227 patents literally or under the doctrine of equivalents. We also find that APP has failed to establish by clear and convincing evidence that the patents-in-suit are invalid. We therefore enter judgment against Lampi and in favor of APP on Count I of Lampi's Third Amended Complaint. We also enter judgment in favor of APP and against Lampi on Counts V–VII of its Third Amended Complaint because Lampi offered no evidence in support of these claims at trial. Because this court granted summary judgment on counts II–IV of Lampi's Third Amended Complaint in December of 1995, there are no claims from Lampi's Complaint that remain unresolved. Finally, we enter judgment against APP and in favor

of Lampi on Counts I–V of APP's counter-complaint because no evidence was introduced at trial in support of these claims.

It is so ordered.